## THE FOLMINA.

### (District Court, E. D. New York. November 17, 1905.)

SHIPPING—DAMAGE TO CARGO—LIABILITY OF VESSEL.

In an action to recover for damage to a cargo of rice alleged to have been received by the ship in good condition but to have been delivered at the end of the voyage in a damaged condition due to sea water and consequent heating, where the owners of the vessel clearly show that she was seaworthy and in all respects properly equipped for the carriage of the cargo at the beginning of the voyage, and also at its termination, that the cargo was properly stowed and that there was no negligence during the voyage which would account for the entry of sea water, they have fully established a defense under a bill of lading which exempted the vessel from liability for damage from sweating, natural decay, or from sea water caused without the ship's fault or negligence.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 440, 449, 484.]

In Admiralty. Action for damage to cargo.

Butler, Norman & Mynderse (Frederick M. Brown, and Archibald G. Thacher, of counsel), for libelants.

Convers & Kirlin (J. Parker Kirlin and John M. Woolsey, of counsel), for claimant.

THOMAS, District Judge. The steamship Folmina, between February 4th and May 9th, carried in No. 3 lower hold rice in bags, from Japan to New York. During discharge the rice on the starboard side was found damaged. The area of the injury was downward from the first six tiers of bags to the bottom of the hold, which was dry, forward from about the after end of the hatchway nearly to the bulkhead, and inboard about three or four bags. Planks several inches apart were fastened to and ran longitudinally along the perpendicular frames connected with the side plating of the ship and about 9 inches therefrom, and athwart such planks were arranged bamboo poles, 2 or 3 inches apart, and the lattice work thus formed supported mats. The bulkheads of the hold were similarly protected, and the ceiling was covered with dunnage, laid fore and aft, a second layer athwartship to which mats were attached. Three iron stringers, the upper one 5 feet, the middle one 10 feet, and the lower one 14 feet 2 inches below the between decks, were fastened to the perpendicular frames, with their outboard edges attached to the plating of the ship, from which their inboard side was distant about 2 feet. Angle irons were attached to each stringer, whereby was formed a trough, in its greater part about 15 inches wide and 3½ inches deep. It ran the whole length of the hold, in which dunnage, planks were placed, but any water entering the trough could escape at the ends of the hold, where holes were provided therefor. During and after the discharge it was found that either there was water standing in the trough for some distance, or at least that it was wet. The dunnage, poles, and mats were in a condition variously described as "damp," "wet," "wringing wet," "sopping wet," "soaking wet"; the bags were de-

scribed as "wet," "damp," "stained," "very wet," "hot," "black and rotted"; the rice as "off color," "caked," "mouldy." The odor from the mass was noticeably bad. That many of the bags and rice therein were impaired, seriously injured, or destroyed by the dampness and heat, cannot be doubted. There was some evidence of negligible damage to the bags on the port side. The libel states that the rice was delivered, "but not in like good order and condition as when received, 877 bags of said rice being wet with sea water and 8,564 bags thereof being seriously damaged by heating, owing to the proximity of said wet bags or through some other cause to the libelants unknown, at the time of said delivery to the libelants."

The answer alleges that the damage was caused by "sweat or heat, or by inherent deterioration due to its condition at time of shipment," and that the condition of the goods on arrival was the result of "sweating, heat, or natural decay due to the inherent and natural condition of the goods or to the latent dampness thereof due to wetting in craft in coming to the ship or while in store or on shore, or to defects in the preparing of said goods for shipment, or to perils of the seas, rivers, or navigation within the meaning of the foregoing exception, and that the said condition of the said goods and the damage, if any, resulting therefrom, were not consequent upon any neglect or default on the part of the steamship or those in charge thereof."

The bill of lading exempted the carrier from liability for any loss or damage from "the act of God, * * * loss or damage from machinery, boilers or steam, or from explosion, heat or fire on board, in hulk or craft or on shore * * * risk of craft or hulk or transshipment and all and every the dangers and accidents of the seas, rivers and canals and of navigation of whatever nature or kind. * * * The ship is not liable for insufficient packing or reasonable wear and tear of packages, * * * leakage, breakage, * * * sweat, rust, decay, vermin, rain, spray."

The evidence shows that the damage was caused by sweat and heat, or sea water and consequent heat. For some purposes of discussion let it be assumed that sea water entered and injured the cargo. Yet the evidence shows that it did not enter by reason of any negligence on the part of the master or crew, or of the carrier in outfitting the ship for the voyage. Hence, the invasion of the sea was beyond the cognizance or avoidance of the carrier or his servants, and without the fault of either. What was demandable of owners or crew to keep out sea water they did. There was upon arrival at New York no defect in the ship that accounted for the sea water. None was discovered during the voyage, whose history also shows that the crew by culpable action or omission did not suffer it to enter. Hence, when the libelant charges receipt of sound goods and delivery of the same injured by sea water, the carrier shows that neither he nor his servants were negligent in connection with the suggested injurious cause. The rule that when the fact is in doubt, or the court is in doubt as to the fact, the burden is on the carrier to solve the doubt, has been fully met. The carrier points to a sound ship, to which sea

water could not gain access, and shows the existence of such condition during the voyage, and due preparation of the ship for the protection of the cargo, and ample care during the voyage. Satisfactory and uncontradicted evidence that no defect discoverable in the exercise of requisite care existed between the receipt and discharge of the cargo is maximum proof. Evidence can produce no higher probative effect. Pass in review the variety of ways that sea water could enter, and the carrier's evidence meets them one by one and negatives not only the presence of every such opportunity, but also any negligence that would permit it. Both the fact and fault permitting its existence are absent. Immediately one suggests any practical way for sea water to enter, for instance around the scupper pipe, the ship is shown to have been sound in such respect. Was the way through a yielding plate? Not a strained or started rivet nor stained plate justifies even suspicion. Was the entry through the ventilators or hatches? They are shown to have been closed during all weather that would permit it, and the sound condition of the hold spaces and other cargo disputes the possibility. Yet the libelants persist that the ship should, to free itself, make further disclosure. Why? Conjecture even as to the cause has been exhausted, and the carrier to such limit has shown his innocence. Neither imagination nor experience suggests any way for the sea water to enter that is not negatived, or at least the evidence shows that the carrier did not contribute to it. Hence, the highest and most comprehensive proof has been reached. When it appears that the carrier not only used due diligence to furnish a seaworthy ship, but did actually furnish the same, that he used proper care in stowing the cargo, that his servants did not, by undutiful act or omission, suffer the cargo to be injured, that no defect was discovered during the voyage, and none existed at its termination, the carrier and his servants, at least, are not chargeable with negligence. Neither is the carrier in this case liable as an insurer, for he expressly stipulated against damage from sea water, to which was impliedly attached the proviso that his own and his servants' fault did not aid or suffer the same. Now the absence of the fault has been shown. Hence the proviso has been met and the stipulation for exemption takes effect. There may be some mystery about the damage. There would be none if the fact were that sweat and heat caused the injury, and there would be no difficulty in finding that as a fact, if the report of the libelants' analysis had not shown an undue proportion of salt in the bags and injured rice. The claimant's contention, that the rice absorbed the remnant of mineral salt on an earlier voyage carried in the same hold, may have some value. If the injurious cause was sea water, its means of access is beyond the bounds of human research or discovery, and the law should not require the performance of impossibilities, as a condition of a carrier's exculpation. Indeed, the impossibility of discovering how the sea water could enter a sound and properly navigated ship, strongly aids the evidence that it did not enter. But that is left undecided. If the injury was the result of

sweating, heat, or natural decay due to the inherent and natural condition of the goods, the ship is not liable, unless the act or omission of the owner or his servants intervened to incite or to aid such cause, which is not the case. Clark v. Barnwell, 12 How. (U. S.) 282, 13 L. Ed. 985; The Prussia, 93 Fed. 837, 840, 35 C. C. A. 625.

If the injury arose from sea water, without the carrier's fault, he is released by the stipulation, provided he shows that fact. Clark v. Barnwell, supra; Transportation Co. v. Downer, 11 Wall. 129, 20 L. Ed. 160; Cau v. Texas & Pacific Ry. Co., 194 U. S. 427, 24 Sup. Ct. 663, 48 L. Ed. 1053. The evidence shows that it did arise either from heat and sweat, or sea water and consequent heat. Hence, the case is within the exception, and in either alternative the evidence exculpates the ship. In the present case the ship, from physical examination, appears to have been absolutely seaworthy at every stage of the adventure. To this it is answered that she was not seaworthy when and where the assumed sea water entered; and to this it is replied that the owner and his servants used diligence respecting every part or equipment whereby water, by any conjecture, could enter. Considering the recent construction of the vessel, her use and care after construction, the dry docking in New York preliminary to her eastern voyage, the inspection and care of the hold before the rice was loaded, the fact that she appeared in perfect condition upon her arrival, even to the degree that not a single suspicious condition appeared, all this points to but one conclusion, that the owners or their agents used due care in sending her out from Japan, and the crew discovered no defect on the way, and that no defect was discoverable. It does not seem just to condemn a ship with such a history.

The decision is placed upon the ground that the facts show that the ship was not negligent, although the Supreme Court has decided (Clark v. Barnwell, supra; Transportation Co. v. Downer, supra; Cau v. Texas & Pacific Ry. Co., supra) that when the carrier shows that a sea peril, in this case sea water, within the exception of the bill of lading, did the damage, the burden is upon the shipper to prove that the carrier's negligence intervened. But for these decisions it would seem that such position could not be sustained logically or by reference to recognized and pertinent legal principles. But in view of the succession of authoritative rulings, and of the respect due them, discussion at this time is precluded.

The libel will be dismissed, with costs.